UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**26-CR-60163-GAYLES/AUGUSTIN-BIRCH**
Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

LAURA SEILER-ANSTETT,

           Defendant.

_____/

> FILED BY_____ **BM** ____D.C.
>
> **Jun 16, 2026**
>
> ANGELA E. NOBLE
> CLERK U.S. DIST. CT.
> S. D. OF FLA. - MIAMI

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.  The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

2.  Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

4.      Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part B covered, among other things, items and services provided by physicians, medical clinics, laboratories, and other qualified health care providers, including office visits and durable medical equipment ("DME"), that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

5.      Health care providers, such as DME suppliers, that provided items and services to beneficiaries were referred to as "providers." Providers were able to apply for and obtain a Medicare "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

6.      Claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number or Medicare Beneficiary Identifier; (b) the date on which the benefit, item, or service was provided or supplied to the beneficiary; (c) the billing code(s) for the benefit, item, or service; and (d) the name of the referring provider, as well as that provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier. Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically via interstate wires. When submitting claims to Medicare for reimbursement, providers were required to certify that: (a) the contents of the claim forms were true, correct, and complete; (b) the forms were prepared in compliance with the laws and regulations governing Medicare; and (c) the items and services that were purportedly provided, as set forth in the claim forms, were medically necessary.

7. Medicare would only pay for items and services that were medically reasonable and necessary, eligible for reimbursement, and provided as represented. Medicare would not pay claims for items and services that were procured through the payment of illegal kickbacks and bribes.

8. CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for items and services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered item or service.

9. To receive Medicare reimbursement, providers, such as a DME supplier, had to make an appropriate application to the MAC and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855S, was required to be signed by an authorized representative of the provider. CMS Form 855S contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [the provider]. The Medicare laws, regulations, and program instructions are available through the [MAC]. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute…).

10. CMS Form 855S contained additional certifications that the DME supplier "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

11.     CMS Form 855S also required applicants to disclose to Medicare any individual or organization with an ownership interest, partnership interest, or managing control of a DME supplier. This included: (a) all individuals and organizations with five percent or more of an ownership stake, either direct or indirect, in the DME supplier; (b) all individuals or organizations with a partnership interest in the DME supplier, regardless of the partner's percentage of ownership; (c) all organizations with "managing control" of the DME supplier; and (d) all "managing employees."

12.     CMS Form 855S defined an organization with "managing control" of a DME supplier as "[a]ny organization that exercises operational or managerial control" over the DME supplier or "conducts the day-to-day operations" of the DME supplier. CMS Form 855S defined "managing employee" as "a general manager, business manager, administrator, director, or other individual who exercises operational or managerial control over, or who directly or indirectly conducts the day-to-day operations" of the DME supplier, "either under contract or through some other arrangement, whether or not the individual is a W-2 employee" of the DME supplier.

13.     Payments under Medicare Part B were often made directly to the provider rather than to the beneficiary.

### Durable Medical Equipment

14.     Medicare Part B covered an individual's access to DME, such as off-the-shelf ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively, "braces"). Off-the-shelf braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

4

15. A claim for DME submitted to Medicare qualified for reimbursement only if the DME was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed physician or other qualified health care provider.

**The Defendant and Relevant Entities and Individuals**

16. **LAURA SEILER-ANSTETT** was a resident of Broward County, in the Southern District of Florida.

17. Samuel Pany ("Pany") was a resident of Broward County, in the Southern District of Florida.

18. Devon O'Malley ("O'Malley") was a resident of Broward County, in the Southern District of Florida.

19. Brandon Boyanoski ("Boyanoski") was a resident of Lackawanna County, in the Middle District of Pennsylvania.

20. Kathie Silva ("Silva") was resident of San Diego County, in the Southern District of California.

21. Co-Conspirator 1 was a resident of Palm Beach County, in the Southern District of Florida.

22. MedAct Billers, LLC ("MedAct") was a company formed under the laws of Florida, with its principal place of business in Margate, Florida, in the Southern District of Florida. **LAURA SEILER-ANSTETT** was the listed owner of MedAct. MedAct was a billing company that submitted claims to Medicare on behalf of DME suppliers.

23. Intelibill Professional Services LLC ("Intelibill") was a company formed under the laws of Florida, with its principal place of business in Margate, Florida, in the Southern District of

5

Florida. **LAURA SEILER-ANSTETT** was the listed owner of Intelibill. Intelibill was a billing company that submitted claims to Medicare on behalf of DME suppliers.

24. Home Medical Equipment and Supplies LLC ("Home Medical") was a company formed under the laws of Oregon, with its principal place of business in Newport, Oregon.

25. Serenity DME LLC ("Serenity DME") was a company formed under the laws of Florida, with its principal place of business in Fort Pierce, Florida, in the Southern District of Florida.

26. Sunshine DME Supplies, LLC ("Sunshine DME") was a company formed under the laws of Florida, with its principal place of business in Pompano Beach, Florida, in the Southern District of Florida.

27. Infinity Medical Supply LLC ("Infinity") was a company formed under the laws of Florida, with its principal place of business in Oakland Park, Florida, in the Southern District of Florida. O'Malley and Pany were beneficial owners, operators, and/or managers of Infinity.

28. Cardinal Care Medical Supply, Inc. ("Cardinal Care") was a company incorporated under the laws of Florida, with its principal place of business in Delray Beach, Florida, in the Southern District of Florida. Pany was the beneficial owner, operator, and/or manager of Cardinal Care.

29. Ridgeline Medical, Inc. ("Ridgeline Medical") was a company incorporated under the laws of Florida, with its principal place of business in Coral Springs, Florida, in the Southern District of Florida. Pany was the owner, operator, and/or manager of Ridgeline Medical.

30. Family Medical Equipment, LLC ("Family Medical") was a company formed under the laws of Florida, with its principal place of business in Lake Worth, Florida, in the

Southern District of Florida. Pany was the beneficial owner, operator, and/or manager of Family Medical.

31.     18221 Enterprises LLC ("18221 Enterprises") was a company formed under the laws of Florida, with its principal place of business in Lake Worth, Florida, in the Southern District of Florida. Pany was the beneficial owner, operator, and/or manager of 18221 Enterprises.

32.     Effortless Medical Supply Inc. ("Effortless Medical") was a company incorporated under the laws of Florida, with its principal place of Deerfield Beach, Florida, in the Southern District of Florida. O'Malley was the beneficial owner, operator, and/or manager of Effortless Medical.

33.     Cypress Health Solutions LLC ("Cypress Health") was a company formed under the laws of Florida, with its principal place of business in Fort Pierce, Florida, in the Southern District of Florida.

34.     Prine Medical, Inc. ("Prine") was a company incorporated under the laws of Pennsylvania, with its principal place of business in Dunmore, Pennsylvania. Boyanoski was the beneficial owner, operator, and/or manager of Prine.

35.     Rostko DME Inc. ("Rostko") was a company incorporated under the laws of Pennsylvania, with its principal place of business in Dunmore, Pennsylvania. Boyanoski was the beneficial owner, operator, and/or manager of Rostko.

36.     HealthStar LLC ("HealthStar") was a company formed under the laws of California, with its principal place of business in San Diego, California. Silva was the owner, operator, and/or manager of HealthStar.

37.     Spectra Health & Wellness LLC ("Spectra Health") was a company incorporated under the laws of Florida, with its principal place of business in Fort Pierce, Florida, in the

7

Southern District of Florida. Silva was the beneficial owner, operator, and/or manager of Spectra Health.

38. Home Medical, Serenity DME, Sunshine DME, Infinity, Cardinal Care, Ridgeline Medical, Family Medical, 18221 Enterprises, Effortless Medical, Cypress Health, Prine, Rostko, HealthStar, and Spectra Health (collectively, the "DME Companies") were DME suppliers that purportedly provided braces to Medicare beneficiaries.

39. Pany, O'Malley, Boyanoski, Silva, and Co-Conspirator 1 (collectively, the "DME Owners") were the actual and/or beneficial owners of certain of the DME Companies.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around August 2018, and continuing through in or around June 2022, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**LAURA SEILER-ANSTETT,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with the DME Owners, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a. to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control

8

of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.  to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.  It was a purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves by, among other things: (a) opening multiple DME suppliers, including but not limited to the DME Companies, and enrolling them with Medicare in a manner that concealed their true beneficial ownership and management; (b) obtaining beneficiary referrals and doctors' orders for medically unnecessary DME through deceptive telemarketing practices and through the payment of illegal kickbacks and bribes to marketing companies; (c) submitting and causing the submission, via interstate wire communications, of false and fraudulent claims for DME to Medicare that was medically unnecessary, ineligible for reimbursement, and procured through the payment of illegal kickbacks and bribes; (d) concealing and causing the concealment of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and her co-conspirators sought to accomplish the objects and purpose of the conspiracy, included, among other things:

4. **LAURA SEILER-ANSTETT** enrolled and caused certain of the DME Companies to be enrolled with Medicare in a manner that concealed the ownership and management roles of Pany, O'Malley, Boyanoski, and others, by falsely and fraudulently identifying nominee owners or partial owners as the sole owners and managers of the DME Companies in the enrollment documents submitted to Medicare. **SEILER-ANSTETT**, Pany, O'Malley, Boyanoski, and others did this to spread billing for DME across multiple DME companies to evade Medicare's scrutiny of false and fraudulent claims and maximize Medicare reimbursements.

5. **LAURA SEILER-ANSTETT** consulted with and advised the DME Owners, among others, as to how to best structure and operate their DME companies to avoid detection of fraudulent practices by Medicare. **SEILER-ANSTETT**'s advice included, among other things, (1) placing the companies in the names of nominee owners to conceal the true owners' identities; (2) limiting the volume of billing through each DME company to avoid Medicare's oversight and scrutiny; (3) spreading the billing of DME for a single beneficiary across different dates to make it less obvious to Medicare that the beneficiary was being prescribed excessive and medically unnecessary DME; (4) avoiding the submission of claims for beneficiaries residing in states where Medicare conducted audits at a higher rate; and (5) spreading the billing across multiple DME companies to give the appearance of a lower volume of billing to avoid scrutiny from Medicare.

6. **LAURA SEILER-ANSTETT** introduced the DME Owners to purported marketers so that the DME Owners could pay illegal kickbacks and bribes to those purported marketers in exchange for beneficiary referrals and signed doctors' orders that were obtained

10

through deceptive telemarketing campaigns designed to trick and coerce elderly beneficiaries into agreeing to receive DME that they did not want or need.

7.     **LAURA SEILER-ANSTETT**, through MedAct and Intelibill, billed Medicare for the prescribed DME on behalf of the DME Companies and other DME suppliers, knowing that the claims she submitted were based on doctors' orders obtained through (1) telemedicine doctors who were not the beneficiaries' treating physicians and did not perform any examinations on the beneficiaries to determine the medical necessity of the DME prescribed, and (2) a fraudulent tactic called "doctor chase," which involved faxing a misleading doctor's order, often containing deceptive information about the beneficiary's need and desire for the DME requested, to the beneficiary's treating physician to trick the treating physician into signing the order.

8.     In exchange for submitting these false and fraudulent claims to Medicare, **LAURA SEILER-ANSTETT** collected a percentage of the Medicare reimbursements the DME Companies and other DME suppliers received.

9.     When Medicare denied fraudulent claims for DME submitted by **LAURA SEILER-ANSTETT**, **SEILER-ANSTETT** altered billing practices for the affected DME Companies and other DME suppliers by (1) billing for different products using different codes that were not the subject of Medicare denials, but were procured through the same deceptive telemarketing practices and illegal kickbacks and bribes described above; (2) reducing billing for beneficiaries residing in certain states with high Medicare denial rates and instead focusing on states where **SEILER-ANSTETT** perceived less Medicare scrutiny; (3) obtaining replacement doctors' orders signed by different doctors who had not yet been flagged by Medicare as suspect; and (4) shifting billing from doctors' orders obtained through telemedicine to doctors' orders

11

obtained through the "doctor chase" model to generate the false appearance that the beneficiaries' treating physicians had evaluated them for the DME.

10.     **LAURA SEILER-ANSTETT** prepared, submitted, and caused to be prepared and submitted documents to Medicare on behalf of the DME Companies, among others, in response to Medicare audits, including audits resulting from claims submissions for medically unnecessary DME and beneficiary complaints of fraud. The documents **SEILER-ANSTETT** submitted and caused to be submitted to Medicare on behalf of the DME Companies and other DME suppliers included doctors' orders that falsely stated that certain physical examinations had been conducted on beneficiaries even though those doctors' orders were signed by telemedicine doctors who could not have performed the examinations as represented.

11.     Through her companies, MedAct and Intelibill, **LAURA SEILER-ANSTETT** and her co-conspirators submitted and caused the submission of more than $58.3 million in false and fraudulent claims to Medicare, via interstate wire communications, for DME that was medically unnecessary and ineligible for reimbursement. Medicare paid approximately $30 million based on these false and fraudulent claims.

12.     From in or around August 2018 to in or around June 2022, the DME Companies paid **LAURA SEILER-ANSTETT** a percentage of the reimbursements they received from Medicare totaling approximately $1,796,802.

13.     **LAURA SEILER-ANSTETT** and her co-conspirators used the fraud proceeds received from Medicare to benefit themselves and others, and to further the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2–5
### Health Care Fraud
### (18 U.S.C. §§ 1347, 2)

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around August 2018, and continuing through in or around June 2022, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

### LAURA SEILER-ANSTETT,

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice for the defendant and others to unlawfully enrich themselves by, among other things: (a) opening multiple DME suppliers, including but not limited to the DME Companies, and enrolling them with Medicare in a manner that concealed their true beneficial ownership and management; (b) obtaining beneficiary referrals and doctors' orders for medically unnecessary DME through deceptive telemarketing practices and through the payment of illegal kickbacks and bribes to marketing companies; (c) submitting and causing the submission, via interstate wire communications, of false and fraudulent claims for DME to Medicare that was medically unnecessary, ineligible for reimbursement, and procured through the payment of illegal kickbacks and bribes; (d) concealing and causing the concealment

13

of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

### The Scheme and Artifice

4. The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### Acts in Execution or Attempted Execution of the Scheme and Artifice

5. On or about the dates specified below as to each count, in Broward County, in the Southern District of Florida, and elsewhere, the defendant, in connection with the delivery of and payment for healthcare benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, that is, Medicare, in that the defendant submitted, and caused the submission of, false and fraudulent claims, seeking the identified dollar amounts, and representing that such benefits, items, and services were medically necessary, eligible for Medicare reimbursement, and provided to beneficiaries as claimed:

| Count | Medicare Beneficiary | Billing Provider | Approx. Claim Submission Date | Claim No. and Product Code (Description) | Approx. Amount Billed |
|---|---|---|---|---|---|
| 2 | P.C. | Prine | Sept. 20, 2021 | 121263793801000 L1851 (knee brace) L2397 (knee sleeve) | $967 |
| 3 | P.C. | Prine | Sept. 21, 2021 | 121264748501000 L1851 (knee brace) L2397 (knee sleeve) | $967 |

| Count | Medicare Beneficiary | Billing Provider | Approx. Claim Submission Date | Claim No. and Product Code (Description) | Approx. Amount Billed |
|-------|---------------------|------------------|-------------------------------|------------------------------------------|-----------------------|
| 4 | C.A.D. | Rostko | May 6, 2022 | 122126730934000 L1851 (knee brace) L2397 (knee sleeve) | $929 |
| 5 | C.A.D. | Rostko | May 9, 2022 | 122129752528000 L1851 (knee brace) L2397 (knee sleeve) | $929 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(7))

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for alleging criminal forfeiture to the United States of America of certain property in which the defendant, **LAURA SEILER-ANSTETT**, has an interest.

2.      Upon conviction of a conspiracy to commit a violation of Title 18, United States Code, Sections 1349 or 1347, as alleged in this Indictment, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation pursuant to Title 18, United States Code, Section 982(a)(7).

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the court;

15

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

    All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures outlined at Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

█████████████████████

FOREPERSON

_____ FOR
JASON A. REDING QUINONES
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

LORINDA LARYEA, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
AISHA SCHAFER HYLTON
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

CASE NO. _____

**v.**

Laura Seiler-Anstett,

**CERTIFICATE OF TRIAL ATTORNEY**

_____ /
Defendant.

**Superseding Case Information:**

New Defendant(s) (Yes or No) _____

**Court Division** (select one)

Number of New Defendants _____

☐ Miami    ☐ Key West    ☐ FTP

Total Number of New Counts _____

☒ FTL    ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) __No__
   List language and/or dialect: _____

4. This case will take ___7___ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   **(Check only one)**          **(Check only one)**

   I    ☐ 0 to 5 days            ☐ Petty
   II   ☒ 6 to 10 days           ☐ Minor
   III  ☐ 11 to 20 days          ☐ Misdemeanor
   IV   ☐ 21 to 60 days          ☒ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) __No__
   If yes, Judge _____ Case No._____

7. Has a complaint been filed in this matter? (Yes or No) __No__
   If yes, Judge _____ Magistrate Case No._____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) __No__
   If yes, Judge _____ Case No._____

9. Defendant(s) in federal custody as of N/A _____

10. Defendant(s) in state custody as of N/A _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) __No__

13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) __No__

14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? __No__

15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? __No__

16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? __No__

17. Did this matter involve the participation of or consultation with Magistrate Judge Yeney Hernandez during her tenure at the U.S. Attorney's Office, which concluded on April 2, 2026? __No__

By: _____
Aisha Schafer Hylton
Assistant United States Attorney
SDFL Court ID No.    A5503133

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  **LAURA SEILER-ANSTETT**

**Case No**: _____

Counts #: 1

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349
**\* Max. Term of Imprisonment: Twenty (20) years as to each count**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: Three (3) years**
**\* Max. Fine: $250,000**

Count #: 2 - 5

Health Care Fraud

Title 18, United States Code, Section 1347
**\* Max. Term of Imprisonment: Ten (10) years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: Three (3) years**
**\* Max. Fine: $250,000**

**\*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**